FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2016 FEB 22  AM 11: 53

CLERK _____
SO. DIST. OF GA.

FORM TO BE USED BY PRISONERS IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983
in the UNITED STATES DISTRICT COURT for the SOUTHERN DISTRICT of GEORGIA

KARL C. MITCHELL

GDC No. 1263349

**SUPPLEMENTAL COMPLAINT**

(Enter above full name of plaintiff or plaintiffs)

v.

CIVIL ACTION NO.: 6:15-cv-93

STANLEY WILLIAMS, et al.

(Enter above full name of defendant or defendants)

I.    Previous lawsuits

A.    Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action?     Yes_____  No  X

if your answer to A is yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

1.    Parties to this previous lawsuit:

Plaintiffs:  N/A

Defendants:

2.    Court (if federal court, name the district; if state court, name the county):

N/A

3.    Docket number:

4.    Name of judge assigned to case:

5. Disposition
   (for example, was the case dismissed? appealed? is it still pending?):

   _____

6. Approximate date of filing lawsuit: _____

7. Approximate date of disposition: _____

8. Were you allowed to proceed *in forma pauperis* (without prepayment of fees)?                                          Yes **N/A**   No **N/A**

B. While incarcerated or detained in any facility, have you brought any lawsuits in federal court which deal with facts other than those involved in this action?
   Yes **X**   No_____

   If your answer to B is yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

   1. Parties to previous lawsuit:

      Plaintiffs:  _Karl C. Mitchell_____

      Defendants: _Warden Crickmar, et al._____

   2. Court (name the district):

      _Northern District of Georgia_____

   3. Docket number:  _4:15-CV-37_____

   4. Name of judge assigned to case: _HLM-WET_____

   5. Disposition
      (for example, was the case dismissed? appealed? is it still pending?):

      _Voluntarily Dismissed_____

   6. Approximate date of filing lawsuit: _February 23, 2015_____

2

I. **Previous Lawsuits**

B. (Cont'd)

1. Parties to this previous lawsuit:

    Plaintiffs: Karl C. Mitchell, GDC No. 1263349

    Defendants: Warden Crickmar, et al.

2. Court: Northern District of Georgia

3. Docket Number: 4:15-CV-104

4. Name of judge assigned to case: HLM-WEJ

5. Disposition: Pending

6. Approximate date of filing lawsuit: June 17, 2015

7. Approximate date of disposition: Pending

8. Were you allowed to proceed *in forma pauperis*: Yes X No _____

7.    Approximate date of disposition:   May 11, 2015

8.    Were you allowed to proceed *in forma pauperis* (without prepayment of fees)?                 Yes X    No_____

C.    As to any lawsuit filed in federal court where you were allowed to proceed *in forma pauperis*, was any suit dismissed on the ground that it was frivolous, malicious, or failed to state a claim?               Yes_____ No X

    1.    If your answer to C is yes, name the court and docket number for each case:

        N/A                    N/A

II.    Place of present confinement:   Georgia State Prison

A.    Is there a prisoner grievance procedure in this institution?   Yes X   No_____

B.    Did you present the facts relating to your complaint to the appropriate grievance committee?                      Yes X   No_____

C.    If your answer to B is yes:

    1.    What steps did you take?  I filed an emergency grievance on June 16, 2015.

    2.    What was the result?  This grievance was downgraded but never answered.

3

3.   Did you appeal any adverse decision to the highest level possible in the administrative procedure?                    Yes_____   No _X_

If yes, what was the result? I was prevented from appealing because, even though I requested an answer and appeal forms so I could file an appeal several times, I was not given an answer to appeal or any appeal forms.

D.   If you did not utilize the prison grievance procedure, explain why not: _____

N/A

IV.   Parties

(In Item A below, list your name as plaintiff and current address. Provide the name and address of any additional plaintiffs on an attached sheet.)

A.   Name of plaintiff: Karl C. Mitchell, GDC No. 1263349
Address: Georgia State Prison
2164 Georgia Highway 147
Reidsville, Georgia 30499

(In Item B below, list the defendant's full name, position, place of employment, and current address. Provide the same information for any additional defendants in Item C below.)

B.   Name of defendant: Stanley Williams
Position: Warden
Place of employment: Georgia State Prison
Current Address: 2164 Georgia Highway 147
Reidsville, Georgia 30499

C.   Additional defendants: _____
Name of defendant: Roy Sabine
Position: Health Services Administrator
Place of employment: Georgia State Prison
Current Address: 2164 Georgia Highway 147
Reidsville, Georgia 30499

4

Name of defendant:   Doctor Broom

Position:   Health Services Physician

Place of employment:   Georgia State Prison

Current Address:   2164 Georgia Highway 147
                             Reidsville, Georgia 30499


Name of defendant: Georgia Department of Corrections

Position:   Government Agency of the state of Georgia


## V.   Statement of Facts

1.   In September of 2014, plaintiff was brutally assaulted by two inmates at Hays State Prison ("Hays") in Trion, Georgia.

2.   During that assault, plaintiff was stabbed several times with a metal rod that had been fashoined into an ice-pick.

3.   While being subdued by one inmate ("the Unidentified Inmate") and stabbed by the other, the Unidentified Inmate was accidentally stabbed in his arm.

4.   As a consequence of plaintiff being stabbed several times with the weapon after the Unidentified Inmate had been stabbed with it, plaintiff contracted Hepatitis C.

5.   In November of 2014, plaintiff was transferred from Hays to Georgia State Prison ("GSP") in Reidsville, Georgia.

6.   In December of 2014, plaintiff began experiencing symptoms of which he was told by another inmate reflect that he may have Hepatitis C.

7.   After learning that Hepatitis C is a blood-borne disease and only transmissible through blood-to-blood contact, plaintiff began thinking about

the possibilities of where he could have contracted the Hepatitis C; and plaintiff remembered learning — prior to being assaulted at Hays — that the Unidentified Inmate was a Hepatitis C carrier.

8.  Plaintiff subsequently submitted a request to the GSP medical unit to be tested for Hepatitis C.

9.  On February 18, 2015, plaintiff was seen by a GSP physician's assistant ("Dr. Carravatti") in regards to his request to be tested for Hepatitis C.

10.  During Dr. Carravatti's examination of plaintiff, plaintiff explained to Dr. Carravatti that plaintiff had been stabbed in September of 2014 with the same weapon that a known Hepatitis C carrier had been stabbed with and that plaintiff believed that he had, consequently, contracted Hepatitis C.

11.  Plaintiff also informed Dr. Carravatti that the symptoms that he had been experiencing, which compelled his conclusion that he had contracted Hepatitis C, included: stomach pains, nausea, and appetite loss, and he was told jaundice.

12.  In concluding his examination of plaintiff, Dr. Carravatti told plaintiff that he was going to order for plaintiff's blood to be drawn and tested for Hepatitis C and if those test results indicated that plaintiff was, indeed, Hepatitis C positive, additional testing would be done to learn more about plaintiff's condition.

13.  A few days after plaintiff's February 18th appointment with Dr. Carravatti, plaintiff's blood was drawn for the lab tests Dr. Carravatti had ordered.

14.  On or about March 26, 2015, plaintiff was seen by a psychiatrist in regards to his post traumatic stress disorder and the medication he was prescribed for that illness.

15.    During this appointment, the psychiatrist reviewed plaintiff's medical record and told plaintiff that he had then-recently tested positive for Hepatitis B and C antibody and needed to submit a request for an appointment with the the GSP physician to discuss those test results.

16.    That same day, plaintiff submitted a request to GSP's medical unit to be seen by the physician — Doctor Broom ("Dr. Broom") — to discuss the lab test results.

17.    On March 31, 2015, plaintiff was seen and examined by Dr. Carravatti.

18.    During this appointment, Dr. Carravatti informed plaintiff that the lab test results, indeed, reflected that plaintiff was Hepatitis C positive; but the Hepatitis B antibody was nothing to be concerned with because that was normal.

19.    Dr. Carravatti also told plaintiff that in order for plaintiff to be eligible to receive treatment to cure his Hepatitis C, plaintiff would have to have two or more years to serve in prison.

20.    Plaintiff then informed Dr. Carravatti that he had, at that time, almost exactly four years remaining on his prison sentence.

21.    Dr. Carravatti then told plaintiff that he was going to order for plaintiff's blood to be drawn again and that those next lab tests would be to determine plaintiff's viral load and genotype.

22.    Dr. Carravatti also told plaintiff that if he did not mandate treatment and enforce his right to receive treatment, then he would not receive any treatment because of the money that the necessary testing and medication would cost the state.

23.    A few days after plaintiff's March 31st appointment with Dr. Carravatti, plaintiff's blood was drawn for the lab tests.

-7-

24.   Approximately thirty days after plaintiff's March 31st appointment with Dr. Carravatti, plaintiff was seen and examined by Dr. Carravatti.

25.   During this appointment, Dr. Carravatti told plaintiff that his then-recent lab test results indicated that his viral load was approximately 500,000 and his genotype was type 3a.

26.   Dr. Carravatti also told plaintiff that he was going to order for the rest of the necessary tests to be completed and after those tests were done, plaintiff would be seen by the GI Doctor — whose identity is unknown — to discuss a treatment plan for plaintiff's Hepatitis C.

27.   Plaintiff then asked Dr. Carravatti how long it would be before plaintiff was seen by the GI Doctor and before plaintiff began receiving the Hepatitis C treatment.

28.   Dr. Carravatti responded by telling plaintiff that it depended on how long it took for the rest of the testing to be completed and how long after that plaintiff was seen by the GI Doctor, but that plaintiff should begin receiving the Hepatitis C treatment within the then-next two months — no more than three at the latest.

29.   On June 6, 2015, because the symptoms that plaintiff had been experiencing had worsened and because those symptoms began to interfere with plaintiff's daily activities — such as plaintiff's ability to exercise, his concentration on and thinking about his legal work, and his eating habits — plaintiff submitted another request to GSP's medical unit inquiring into why the rest of the necessary tests that Dr. Carravatti told plaintiff needed to be completed, were, at that time, not done; and also into why plaintiff had not been seen by the GI Doctor to discuss a treatment plan for plaintiff's Hepatitis C.

30.   On June 7, 2015, plaintiff wrote to Roy Sabine ("Sabine") — GSP's Health Services Administrator — further inquiring into why plaintiff had not began receiving treatment for his Hepatitis C despite Dr. Carravatti's recommendation; and briefly informing Sabine that plaintiff's symptoms were causing plaintiff severe stomach pain and nausea, which had caused plaintiff to vomit.

31.   Around this same time, Russell Houser ("Houser") — plaintiff's dormitory counselor — approached plaintiff's cell during Houser's rounds in plaintiff's dormitory and he noticed that plaintiff was extremely ill and he asked plaintiff what was wrong.

32.   Plaintiff explained to Houser that plaintiff had Hepatitis C and the symptoms plaintiff was experiencing had worsened tremendously since the heat of the summer had set in, and plaintiff told Houser that GSP's medical staff had been refusing to treat plaintiff's Hepatitis C.

33.   Houser then handed plaintiff a grievance form and told plaintiff to fill it out and that he was first taking it to medical to find out why plaintiff's Hepatitis C was not being treated, and that he was then going to submit it to GSP's then-Chief Counselor Calvin Smith as an emergency grievance.

34.   A few days later, plaintiff received a note from Houser which stated: "(I asked Medical and our Chief Counselor) your grievance was downgraded to a normal grievance because [(1) t]he doctor has seen you already[; (2) t]he prison (Medical) has already done all they're going to do unless you get sick[; and (3) i]f you get sick you need to go to sick-call."[1]

_____

(Doc. 1, at 23.)

35.    In response to plaintiff's June 6th request that plaintiff submitted inquiring into why the testing that he was told needed to be completed, had not been completed; and why plaintiff had not been seen by the GI Doctor to discuss a treatment plan for his Hepatitis C, plaintiff was seen and examined during Chronic Clinic by a new physician's assistant ("Dr. Hall").

36.    During this appointment, Dr. Hall asked plaintiff a series of questions of which she read to plaintiff from what appeared to plaintiff to be a Hepatitis C Treatment Program Enrollment Form ("the form"). After answering each question, Dr. Hall wrote plaintiff's response on the form.

37.    Upon completion of the form and the conclusion of her examination of plaintiff, Dr. Hall told plaintiff that Dr. Broom said that plaintiff's prior chest x-rays that were taken the previous year "looked good"; that plaintiff would be scheduled to have an ultrasound of his liver; that an appointment would be scheduled for plaintiff to be seen by the GI Doctor; and that plaintiff would begin the Hepatitis C treatment in December of 2015.

38.    On July 3, 2015, plaintiff submitted another request to be seen by Dr. Broom because plaintiff's symptoms had become regularly severe — so severe that they caused plaintiff to vomit and dry heave from the nausea, headaches, stomach pain, appetite loss, and mild liver pain.

39.    On July 7, 2015, plaintiff was seen and examined by Dr. Hall in response to plaintiff's July 3rd request to see Dr. Broom.

40.    Upon the completion of her examination of plaintiff, Dr. Hall said that the symptoms that plaintiff had been experiencing were caused by something that he had ate and that plaintiff was having acid-reflux issues, for which she prescribed Zantac.

41.   Plaintiff then explained to Dr. Hall that plaintiff had never had issues with acid-reflux in his entire life, nor had he ever heard of acid-reflux causing anyone headaches or liver pains.

42.   Nonetheless, Dr. Hall insisted that plaintiff would be fine with the Zantac, and she assured plaintiff that he "was on the list" to begin Hepatitis C treatment in December of 2015.

43.   A few days thereafter, during a routine daily inspection in plaintiff's dormitory, plaintiff told Stanley Williams — the Warden of GSP — that plaintiff was in need of Hepatitis C treatment and that the prison's medical staff were refusing to provide him with such treatment, despite their own recommendation that plaintiff receive the treatment.

44.   Williams then asked plaintiff, "What do you mean they're refusing to provide you with treatment."

45.   Plaintiff then told Williams that plaintiff was recommended to receive Hepatitis C treatment and he was told that if he did not mandate treatment and enforce his right to be treated then he would not be treated due to the cost of the testing and treatment.

46.   Williams then said, "Well they are going to have to give me an answer about that."

47.   Plaintiff then explained to Williams that he had filed an emergency grievance regarding his denial of Hepatitis C treatment, but that it was downgraded because someone in medical told Houser that they had done all they were going to do to treat plaintiff's Hepatitis C.

48.   Williams then told plaintiff not to worry about it because he was going "to take care of it."

49. Around or about the end of September of 2015, the ultrasound that had been ordered on plaintiff's liver had been completed.

50. In a subsequent Chronic Care appointment with Dr. Hall, plaintiff was told by Dr. Hall that his liver "looked good" and that he would soon be seen by the GI Doctor to discuss the treatment plan that plaintiff would be, supposedly, beginning in December of 2015.

51. During the months following, however, plaintiff's symptoms persisted but were not as severe as they had been during the summer months. But because it had been made abundantly clear that nothing would be done to treat plaintiff's Hepatitis C until December of 2015, plaintiff patiently waited on December of 2015's arrival, consequently suffering the resulting symptoms of his Hepatitis C — such as stomach pains, nausea, headaches, appetite loss, and mild liver pains; which continued to interfere with plaintiff's exercising, his thinking and concentrating on his legal work, and his eating habits.

52. Around or about the beginning of December of 2015, plaintiff received a flu shot which exacerbated the symptoms that plaintiff was suffering.

53. A few days after receiving this flu shot, plaintiff told Dr. Hall — as she was making her rounds in plaintiff's dormitory — that the flu shot he received had exacerbated his symptoms and he was feeling weird and sharp pains around his liver and extremely ill.

54. Dr. Hall then explained to plaintiff that the flu shot, on its own account, could be the cause of the illness that plaintiff was feeling, and she told plaintiff "to wait a few days and if you don't feel any better fill out a sick-call."

55. On January 1, 2016, because the symptoms that he had been experiencing had not subsided, plaintiff submitted a request to be seen

by Dr. Hall in regards to the flu shot aggravating plaintiff's Hepatitis C.

56.   On January 4, 2016, plaintiff was seen and examined by Dr. Hall in regards to plaintiff's January 1st request.

57.   During this appointment, plaintiff explained to Dr. Hall that he had still been feeling extremely ill and that either his Hepatitis C was worsening or the flu shot he received exacerbated his symptoms.

58.   Plaintiff also asked Dr. Hall when he was supposed to be seen by the GI Doctor and when his Hepatitis C treatment was supposed to begin.

59.   In response, Dr. Hall stated that she did not believe the flu shot was the cause of the illness plaintiff was feeling, and that she did not know when plaintiff would be seen by the GI Doctor or why plaintiff did not begin the Hepatitis C treatment in December of 2015.

60.   Plaintiff then asked Dr. Hall if he was going to have to sue Sabine and Georgia Regents University in order to receive the Hepatitis C treatment.

61.   Dr. Hall responded, " I wouldn't do that, you might piss him off. The treatment is expensive which gives us the choice to treat you, just like you had the choice to do whatever you did to catch the Hepatitis."

62.   Plaintiff then explained to Dr. Hall that Hepatitis C is a serious medical need and that they did not have a choice to treat his Hepatitis C, but rather a duty.

63.   Plaintiff also attempted to tell Dr. Hall to read *Estelle v. Gamble*, 429 U.S. 97 (1976) and *Brown v. Johnson*, 387 F.3d 1344 (11th Cir. 2004), but before plaintiff was able to finish telling Dr. Hall *Estelle's* complete citation, Dr. Hall interjected and stopped plaintiff from speaking.

64.   Dr. Hall then told plaintiff that she did not need to read anything because Hepatitis C is not a serious medical need and that all they were

required to treat is plaintiff's symptoms.

65. Dr. Hall further stated that some people live for years after contracting Hepatitis C and that Hepatitis C was "no big deal."

66. Plaintiff responded, "Well what about the ones that don't?"

67. Dr. Hall answered, "I don't know, I guess they shouldn't have caught Hepatitis. But all we have to do is treat your symptoms."

68. Plaintiff then smiled and said, "Oh yeah, treat my symptoms."

69. Dr. Hall then said, "Yeah lawyer, your symptoms. Now get out of here."

70. Before Dr. Hall and plaintiff's conversation turned into an argument, Dr. Hall did, however, examine plaintiff and she told plaintiff that she was going to order for plaintiff's blood to be drawn and for a urine sample in order to conduct additional lab tests; and before plaintiff exited the examination room, Dr. Hall told plaintiff to write to Sabine and Dr. Broom and ask them when he would begin the Hepatitis C treatment.

71. That night, plaintiff wrote — nearly identical letters — to Sabine and Dr. Broom inquiring into why plaintiff had not begun the Hepatitis C treatment and what he needed to do in order to receive it.

72. As of the below date, neither of those letters have been answered.

73. On January 6, 2015, during a routine daily inspection in plaintiff's dormitory, plaintiff showed Williams a copy of plaintiff's grievance history that he had received from the Assistant Attorney General of Georgia, which showed that the grievance plaintiff filed in regards to him being denied Hepatitis C treatment has been pending a resolution for several months.

74. Plaintiff also explained to Williams that plaintiff had wrote to the GSP Grievance Coordinator — Jacquelyn Ayeni ("Ayeni") — requesting grievance and appeal forms in order to file additional grievances and to

appeal the still-pending denial of Hepatitis C treatment grievance, but Ayeni would not respond to plaintiff's letters.

75.   Williams then told plaintiff to write on a piece of paper exactly what his medical issue was and the grievance number that related to those issues, and that he would take care of it.

76.   Plaintiff then wrote on a piece of paper in big capitol letters: "BEING DENIED HEPATITIS C TREATMENT"; and the denial of Hepatitis C treatment's grievance number and filing date. Plaintiff then slid the piece of paper through the door to Williams.

77.   After Williams read the piece of paper, he said, "You got Hepatitis C and they ain't treating you."

78.   Plaintiff responded, "Yes Sir."

79.   Williams then told plaintiff that he was going to find out why plaintiff was not receiving the Hepatitis C treatment and that he would get plaintiff an answer to his denial of Hepatitis C treatment grievance no later than the following week.

80.   However, plaintiff has neither began receiving Hepatitis C treatment, nor has he received an answer to his denial of Hepatitis C treatment grievance, or an appeal form to appeal the non-response to that grievance, or any indication or affirmation that plaintiff will be soon seen by the GI Doctor to discuss a treatment plan for his Hepatitis C or that he will soon receive the Hepatitis C treatment.

81.   On information and belief, both Sabine and Dr. Broom are equally responsible for ensuring that plaintiff's serious medical needs are adequately treated, and for arranging for plaintiff to be seen by the other medical

-15-

professionals who are competent to assess plaintiff's medical needs and for plaintiff's need for specialized treatment, and who are competent to provide plaintiff with such specialized treatment or to order for it to be provided to plaintiff.

82.   As the Warden of GSP, Williams is responsible for ensuring that plaintiff receives adequate medical care for his serious medical needs and for preventing and correcting unlawful conditions of confinement at GSP.

83.   By virtue of his incarceration within their agency, the Georgia Department of Corrections ("GDOC") is responsible for ensuring that plaintiff receives adequate medical care for his serious medical needs and that plaintiff's disability is reasonably accommodated; and that he is not discriminated against by reason of his disability.

84.   Because plaintiff has been and is still being denied Hepatitis C treatment, plaintiff has suffered and will continue to suffer stomach pains, nausea, headaches, appetite loss, and liver pains; which have and will continue to interfere with plaintiff's daily activities — such as concentrating, eating, exercising, and thinking — unless plaintiff's Hepatitis C is treated.

85.   Additionally, the unreasonable delay and denial of plaintiff's receipt of Hepatitis C treatment has had and still has substantial deteriorative effects on plaintiff's major bodily functions — such as the function and condition of plaintiff's liver, which contributes to the proper and necessary functions of plaintiff's digestive, circulatory and immune systems, all of which are major bodily functions that plaintiff cannot live without.

## VI.  Claims for Relief

86.   Sabine and Dr. Broom's failure to timely provide plaintiff with Hepatitis C treatment, or otherwise, their failure to timely make the

necessary arrangements for plaintiff to be seen by a competent medical professional in order for plaintiff to timely receive Hepatitis C treatment, despite their knowledge of plaintiff's need for such treatment, constitutes deliberate indifference to plaintiff's serious medical needs and caused and continues to cause plaintiff's injuries, which violated and continues to violate plaintiff's rights under the Eighth Amendment to the United States Constitution.

87. Williams' failure to prevent and correct Sabine and Dr. Broom's deliberate indifference to plaintiff's serious medical needs, despite his knowledge that Sabine and Dr. Broom were being deliberately indifferent to plaintiff's need for Hepatitis C treatment and that plaintiff was in need of such treatment; and his failure to ensure that plaintiff received Hepatitis C treatment, constitutes deliberate indifference to plaintiff's serious medical needs and has contributed to and proximately caused and continues to contribute to and proximately cause plaintiff's injuries, which violated and continues to violate plaintiff's rights under the Eighth Amendment to the United States Constitution.

88. The Georgia Department of Corrections' exclusion of plaintiff from the medical services and Hepatitis C treatment programs at GSP, due to the cost of those services and programs, despite its knowledge of plaintiff's need for such services and treatment programs, constitutes discrimination, a failure to reasonably accommodate plaintiff's disability and deliberate indifference to plaintiff's serious medical needs and has contributed to and proximately caused and continues to contribute to and proximately cause plaintiff's injuries, which violated and continues to violate plaintiff's rights under Title II of the Americans with Disabilities Act, and plaintiff's rights under the Eighth Amendment to the United States Constitution.

## VII.  Prayer for Relief

Plaintiff respectfully prays for this Honorable Court to:

1.    Enter declaratory judgements stating that each of the defendants' acts and omissions violated plaintiff's rights under the Eighth Amendment to the United States Constitution; and that the GDOC violated plaintiff's rights under Title II of the Americans with Disabilities Act;

2.    Enter an injunction ordering each of the defendants, or their agents to:

(a)   Immediately arrange for plaintiff to be seen and examined by the GI Doctor, or another competent medical professional, so that a treatment program can be arranged to be administered to plaintiff for his Hepatitis C,

(b)   Immediately take whatever action is necessary to ensure that plaintiff receives the Hepatitis C treatment that is prescribed by the GI Doctor or other medical professional, and

(c)   Carry out the treatment described above until plaintiff's Hepatitis C is completely cured;

3.    Enter judgement in favor of plaintiff for monetary damages against the GDOC, as allowed by law; and,

4.    Enter such additional relief as this Honorable Court may deem just and proper.

This 18th day of January, 2016.

Respectfully Submitted,

*Karl C. Mila*

Plaintiff pro se.

Karl C. Mitchell, 1263349

Georgia State Prison

2164 Georgia Highway 147

Reidsville, Georgia 30499

## DECLARATION OF VERIFICATION

STATE OF: Georgia

COUNTY (CITY) OF: Reidsville

Pursuant to 28 U.S.C. § 1746, I, Karl C. Mitchell, declare under the penalty of perjury that the foregoing is true and correct, and that the statements I have made on information and belief are true and correct to the very best of my knowledge and belief.

EXECUTED ON: January 18, 2016

_Karl C. Mitchell_

Signature of Declarant.

Karl C. Mitchell, 1263349

Georgia State Prison

2164 Georgia Highway 147

Reidsville, Georgia 30499

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2016, I served a true and correct copy of **PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT,** and a true and correct copy of plaintiff's **PROPOSED SUPPLEMENTAL COMPLAINT** on:

Stanley Williams

Georgia State Prison

2164 Georgia Highway 147

Reidsville, Georgia 30499

by placing it in the prison mailbox in a properly addressed envelope with sufficient first class postage affixed thereto.

I further certify that I have filed the above-said documents with the Clerk of Court by using the same method of service described-above.

This 18th day of January, 2016.

Respectfully Submitted,

Karl C. Mitchell

Plaintiff pro se.

Karl C. Mitchell, 1263349

Georgia State Prison

2164 Georgia Highway 147

Reidsville, Georgia 30499